**STORZER & ASSOCIATES, P.C.**
Robert L. Greene
1025 Connecticut Ave., N.W.
Suite 1000
Washington, D.C. 20036
Tel: (202) 857-9766
Fax: (202) 315-3996

**SAVAD CHURGIN, LLP**
Joseph Churgin
55 Old Turnpike Road
Suite 209
Nanuet, New York 10954
Tel: (845) 624-3820
Fax: (845) 624-3821

### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

ORTHODOX JEWISH COALITION OF
CHESTNUT RIDGE, an unincorporated
association, CONGREGATION BIRCHAS
YITZCHOK, a New York religious
corporation, CONGREGATION DEXTER
PARK, CONGREGATION TORAH
U'TFILLA, a New York religious corporation,
ABRAHAM WILLNER, and TZVI MILLER,

           Plaintiffs,

    v.

VILLAGE OF CHESTNUT RIDGE, NEW
YORK,

           Defendant.

Civ. No. 7:19 cv 443

### FIRST AMENDED COMPLAINT

Plaintiffs ORTHODOX JEWISH COALITION OF CHESTNUT RIDGE, a New York

unincorporated association ("OJCCR"), CONGREGATION BIRCHAS YITZCHOK, a New York

religious corporation, CONGREGATION DEXTER PARK, a New York religious corporation,

CONGREGATION TORAH U'TFILLA, a New York religious corporation, ABRAHAM

WILLNER, and TZVI MILLER (collectively "Plaintiffs"), by and through their attorneys, Storzer

& Associates, P.C. and Savad Churgin LLP, hereby complain of Defendant, the VILLAGE OF

CHESTNUT RIDGE, NEW YORK (the "Village") as follows:

1

## INTRODUCTION AND NATURE OF ACTION

1.      The Village of Chestnut Ridge, New York ("Village") has implemented and imposed several land use regulations controlling the use of real property for places of worship within its jurisdiction.  These laws created onerous zoning requirements to be able to use property for religious purposes, including a five-acre minimum lot area requirement and subjecting such uses to the legislative discretion of the Village's Board of Trustees, and treated religious assembly and institutional land uses differently and worse than myriad nonreligious assembly and institutional uses in the Village.

2.      Specifically, the Village's land use regulations applicable to places of worship effectively prevented the members of the Orthodox Jewish community living in the Village of Chestnut Ridge, including the Plaintiffs, from operating and attending synagogues ("*shuls*") in order to engage in religious exercise within the Village.

3.      This action is commenced by Plaintiffs to redress violations of their civil rights, as protected by the First and Fourteenth Amendments to the United States Constitution, the Freedom of Worship provision of the New York Constitution (Article I, section 3), and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3) & (4), 42 U.S.C. §§ 2000cc, *et seq.*, and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States, particularly the First and Fourteenth

Amendments to the Constitution of the United States, and the Religious Land Use and Institutionalized Persons Act of 2000.

5.       This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

6.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred in this District.

## THE PARTIES

7.       Plaintiff OJCCR is an unincorporated association of seven Orthodox Jewish congregations located in the Village of Chestnut Ridge, New York.

8.       Plaintiff CONGREGATION TORAH U'TFILLA is a Religious Corporation organized under the laws of the State of New York on October 23, 2012.

9.       Plaintiff CONGREGATION DEXTER PARK is a Religious Corporation organized under the laws of the State of New York on July 11, 2014.

10.       Plaintiff CONGREGATION BIRCHAS YITZCHOK is a Religious Corporation organized under the laws of the State of New York on October 10, 2010.

11.       Plaintiff ABRAHAM WILLNER is a natural person of the Orthodox Jewish faith residing in the Village of Chestnut Ridge, New York.

12.       Plaintiff TZVI MILLER is a natural person of the Orthodox Jewish faith residing in Chestnut Ridge, New York.

13.       Defendant VILLAGE OF CHESTNUT RIDGE, NEW YORK is a municipal corporation of the State of New York, having offices at 277 Old Nyack Turnpike, Chestnut Ridge,

New York 10977, which, through its governing body, adopted and enforce the land use regulations in question in this matter.

## FACTUAL BACKGROUND

### Plaintiffs and the Burdens on Their Religious Exercise

14.     All of the Plaintiffs practice a form of Judaism that is commonly referred to as ultra-Orthodox Judaism.

15.     Plaintiffs' religious exercise includes prayer, teaching, counseling and other communal religious activity, which constitutes expressive activity.

16.     OJCCR's member congregations have no location at which they can legally exercise their religion communally within the Village.

17.     OJCCR has a particular interest in this litigation based on its own interests.  It also seeks to vindicate its members' rights, and to provide locations for places of worship for its members.

18.     OJCCR asserts those constitutional and statutory rights on behalf of its members.

19.     Plaintiffs Congregation Torah U'Tfilla, Congregation Dexter Park, and Congregation Birchas Yitzchok have no location at which they can legally exercise their religion in the Village.

20.     Plaintiff Tzvi Miller has no location at which he can legally engage in communal worship in the Village.

21.     Plaintiff Abraham Willner has no location at which he can legally engage in communal worship in the Village.

22.     All of OJCCR's member congregations have sought to build or buy property to allow them to build places of worship that would legally accommodate their religious exercise in Chestnut Ridge.

23.     The Village is located within the Town of Ramapo in Rockland County, New York.

24.     The Village is located adjacent to and directly south of Monsey, New York.

25.     A large Orthodox Jewish community is centered in Monsey, New York and has expanded to nearby Villages, including Chestnut Ridge, and the Town of Ramapo.

26.     This Orthodox Jewish population, sometimes referred to as "ultra-Orthodox" or *haredi*, is characterized by distinctive dress, customs, religious practices, and educational needs, among other attributes.

27.     Plaintiffs believe in the Torah's commands that one should "speak of [the Torah's precepts] while you sit in your home, while you walk on the way, when you retire and when you arise."   Deuteronomy 6:5-9.   The Babylonian Talmud, Sabbath 127a, states: "These are the precepts whose fruits a person enjoys in This World but whose principal remains intact for him in the World to Come. They are: the honor due to father and mother, acts of kindness, early attendance at the house of study morning and evening, hospitality to guests, visiting the sick, providing for a bride, escorting the dead, absorption in prayer, bringing peace between man and his fellow - and the study of Torah is equivalent to them all."

28.     Many Orthodox Jews have moved to the Village in the past decade.

29.     This movement by Orthodox Jews to the Village has been met with substantial resistance among many residents in the Village.

30.     It has also been met with legislative action targeting the religious needs of the Orthodox Jewish community.

31.     Plaintiffs' religious beliefs require them to attend a place of worship, or *shul*, for prayer during the week, services on their Sabbath and various other holy days during the year, and other religious activities.

32.     The Sabbath lasts for approximately twenty-five hours, from sunset on Friday until one hour after sunset on Saturday.

33.     The same schedule applies to several holy days during the year.

34.     Plaintiffs' religious beliefs require them to attend four prayer services on the Sabbath, one after sundown on Friday, one on Saturday morning, one on Saturday afternoon, and then a final prayer service at the conclusion of the Sabbath on Saturday evening.

35.     Plaintiffs' religious beliefs require them to have a ritual meal in the approximate hour between the final two Saturday prayer services.

36.     Plaintiffs have no location at which they may legally observe these religious requirements in the Village.

37.     Furthermore, the Plaintiffs cannot legally engage in a variety of religious activities because of the lack of adequate physical facilities in the Village.

38.     These religious activities include: (a) celebration of high holy days, including Yom Kippur and Rosh Hashanah; (b) Bar Mitzvahs; (c) weddings and funerals; (d) lectures related to Judaism; (d) counseling; (e) religious instruction for children; (f) religious instruction for adults; (g) other celebrations of major Jewish Holidays such as Passover, Shavuot, Sukkot, Chanukah and Purim; and (h) other service activities that benefit the community at large.

39.     The Plaintiffs are religiously prohibited from driving or riding in motor vehicles during the Sabbath and on most Holy Days.

40.     In order to fulfill their religious obligations, Plaintiffs must walk to and from their *shuls* for all of the services during their Sabbath and Holy Days.

41.     Plaintiffs cannot walk great distances to attend *shuls* during the Sabbath and on Holy Days for both religious and practical reasons.

42.     Jewish law recognizes limits on how far those observing the Sabbath may travel. Exodus 16:29 states: "See that the Lord hath given you the sabbath; therefore He giveth you on the sixth day the bread of two days; abide ye every man in his place, let no man go out of his place on the seventh day."

43.     Rabbinic authorities have interpreted this verse to prohibit long journeys on the Sabbath.

44.     For women with young children, the elderly and handicapped, any significant distances also render traveling such distances impracticable.

45.     Members of OJCCR and the Plaintiff Congregations have hundreds of members that are either women with young children or elderly.

46.     Two of the required trips during the Sabbath and Holy Days often occur in the dark.

47.     The Village has few sidewalks on its thoroughfares and few street lights, rendering such travel by foot dangerous.

48.     These trips are especially dangerous and arduous in rain and snow.

49.     Plaintiffs are also religiously forbidden to carry anything, including keys, children, prayer books or prayer shawls, or to push strollers or wheelchairs or other things during the Sabbath, unless there is a religious boundary, known as an *eruv*.

50.     While some small *eruvin* (plural of *eruv*) do exist in Chestnut Ridge, there is no universally recognized large *eruv* covering most of the Village.

51.     Consequently, parents of young children are unable to take them to religious services, nor may they take elderly or disabled persons to services throughout most of Chestnut Ridge.

52.     The Plaintiffs and their members also customarily perform certain religious community gatherings known as a *kiddush*.  The term *kiddush* means "to make holy" and usually involves meals shared with other congregants.

53.     Plaintiffs have no location that contain adequate space for a *kiddush* room.

54.     *Kiddush* rooms are also used for the meal that is to be eaten between the final two services on Saturdays.  As there is only approximately one hour between those services, it is not possible for Plaintiffs to leave the *shul*, return home and return to *shul* unless the *shul* is in close proximity to the members' homes.

55.     Additionally, since the Plaintiffs are unable to worship at locations that provide adequate separate areas for women members of the congregations, as required by Plaintiffs' religious beliefs, this further prevents many women from attending services.

56.     At present, there is only one legally permitted *shul* in Chestnut Ridge.  It does not meet the requirements of the Zoning Law; however, upon information and belief it was grandfathered as an existing nonconforming use.

57.     Plaintiff Congregation Torah U'Tfilla has been seeking a location in Chestnut Ridge that would legally meet its religious needs, but has been unable to do so.

58.     Congregation Torah U'Tfilla is unable to find a location that complies with the Village's land use regulations that would meet the needs of its members to practice their religion in Chestnut Ridge.

59.     Congregation Torah U'Tfilla presently meets for religious observance in a rented commercial space under a certificate of use for a lecture hall.

60.     Congregation Torah U'Tfilla's pays very high rent for its rented facilities.

61.     Congregation Torah U'Tfilla has been unable to obtain a certificate of use for a place of worship.

62.     Congregation Torah U'Tfilla's current lease term will expire on or about February 28, 2020.

63.     Congregation Torah U'Tfilla's present location does not have adequate bathroom facilities for its members.

64.     Congregation Torah U'Tfilla's present location does not have adequate facilities for all its male and female members to attend services.

65.     Congregation Torah U'Tfilla's lack of adequate facilities also means that many of its members' children cannot attend.

66.     Congregation Torah U'Tfilla's current facility is located on the outskirts of the Scotland Hill neighborhood of Chestnut Ridge in a commercial zone, and some of its members cannot walk to that location.

67.     Congregation Torah U'Tfilla has lost members and membership dues because the rented facilities that it is forced to use are not centrally located and because it does not have enough room for all to attend services.

68.     Congregation Torah U'Tfilla has incurred fines from the Village and has had to defend itself against violations regarding its temporary synagogue locations.

69.     The costs to cure such violations have been financially prohibitive to the congregation, and have caused the need for costly legal and other professional fees.

70.     Congregation Torah U'Tfilla does not have adequate facilities for a *kiddush* room.

71.     Members of Congregation Torah U'Tfilla have incurred expenses because they were forced to rent social halls for special occasions rather than using the kiddush/simcha room available at a synagogue.

72.     Congregation Torah U'Tfilla has experienced economic losses of donations from potential donors that were wary of supporting a temporary shul location, but would otherwise have supported a permanent place of worship.

73.     Plaintiff Congregation Birchas Yitzchok has purchased a property in Chestnut Ridge to build a *shul* to meet the needs of its ultra-Orthodox members in July 2017 but has not been able to submit plans for its *shul*, since the property does not contain the required five acres.

74.     Congregation Birchas Yitzchok is unable to worship at the property it purchased and must meet in the basement of a private home.

75.     Congregation Birchas Yitzchok has not been able to find a property of five acres in the Village of Chestnut Ridge.

76.     Congregation Birchas Yitzchok is unable to operate a place of worship where all of its members can meet for worship.

77.     Congregation Birchas Yitzchok does not have adequate bathroom facilities for its members.

78.     Congregation Birchas Yitzchok does not have adequate facilities for all of its male and female members to attend services.

79.     Congregation Birchas Yitzchok's lack of adequate facilities also means that many of its members' children cannot attend.

80.     Some members of Congregation Birchas Yitzchok cannot walk to its current location.

81.     Congregation Birchas Yitzchok does not have adequate facilities for a *kiddush* room.

82.     Congregation Birchas Yitzchok has lost members and membership dues because its current location is not centrally located, and because it does not have enough room for all individuals seeking to attend services to do so.

83.     Members of Congregation Birchas Yitzchok has incurred expenses because they were forced to rent social halls for special occasions rather than using the kiddush/simcha room available at a synagogue.

84.     Congregation Birchas Yitzchok has experienced economic losses of donations from potential donors that are wary of supporting a temporary shul location, but would otherwise have supported a permanent place of worship.

85.     Plaintiff Congregation Dexter Park has been unable to find property to allow it to fulfill its religious obligations.

86.     Congregation Dexter Park is currently worshipping in a great room in a home.

87.     Congregation Dexter Park does not have adequate bathroom facilities for its members.

88.     Congregation Dexter Park does not have adequate facilities for all of its male and female members to attend services.

89.     Congregation Dexter Park's lack of adequate facilities also means that many of its members' children cannot attend.

11

90.     Some members of Congregation Dexter Park cannot walk to its current location.

91.     Congregation Dexter Park does not have adequate facilities for a *kiddush* room.

92.     Congregation Dexter Park has lost members and membership dues because its current location is not centrally located and because it does not have enough room for all individuals seeking to attend services to do so.

93.     Congregation Dexter Park has incurred fines from the Village and has had to defend itself against violations issued to its <u>temporary</u> synagogue locations.

94.     The costs to cure such violations have been financially prohibitive to the congregation, and have caused the need for costly legal and other professional fees.

95.     Members of Congregation Dexter Park have incurred expenses because they were forced to rent social halls for special occasions rather than using the kiddush/simcha room available at a synagogue.

96.     Congregation Dexter Park has experienced economic losses of donations from potential donors that are wary of supporting a temporary shul location, but would otherwise have supported a permanent place of worship.

97.     Plaintiff Abraham Willner is a resident of Chestnut Ridge of the ultra-Orthodox religion.  He is affiliated with Congregation Birchas Yitzchok.

98.     Plaintiff Tzvi Miller is a resident of Chestnut Ridge of the ultra-Orthodox religion. He is affiliated with Congregation Dexter Park.

99.     Since the members of OJCCR and the other Plaintiffs are not able to legally operate *shuls* in close proximity to their members, their members are neither able to eat their ritual meal in the *shul*, nor to return home for that meal in time to return for the final religious service, in violation of their religious beliefs.

12

100.    The inability of the Plaintiffs to provide facilities of adequate size for worship also means that there is insufficient space for an area for a women's section for an Orthodox *shul* in the Village.

101.    The inability of the Plaintiffs to find or construct adequate places of worship in Chestnut Ridge substantially burdens the religious exercise of ultra-Orthodox Jewish people and especially women, children and the elderly.

102.    As discussed below, the Village's land use regulations required a place of worship to be located on a property that is at least five acres in size.

103.    This five-acre requirement for a house of worship rendered it effectively impracticable for the Plaintiffs to obtain places of worship to practice their religion.

104.    The Defendant Village has recently published a "Full Environmental Assessment Form" ("FEAF") regarding its zoning regulations for places of worship that states in part that, while there are 2450 residential parcels in the Village, there are only 45 that are five acres or greater, meaning that only 1.8% of the parcels in the Village meet the five-acre requirement.  As of January 7, 2019, only one such parcel was actually for sale.

105.    Furthermore, a single large place of worship would not be accessible by Orthodox Jews who reside in different neighborhoods within the Village.

106.    The FEAF states that "the supply of available lots over 5 acres [is] severely limited, . . . ."

107.    There are virtually no properties in the Village that the Plaintiffs could have located a place of worship under the Defendant's land use regulations.

13

108.   The five-acre minimum lot size for places of worship in the Village, described below, prevented Plaintiffs from using real property as a *shul* by making such compliant property prohibitively expensive.

109.   Defendant Village states in its FEAF that the price of a half-acre vacant lot in the Village is $250,000.00.   Upon information and belief, the price of such lots is at least approximately $400,000.00.  Such cost made it impossible for religious congregations of fifty to one hundred families to purchase parcels where a place of worship could be legally located within the Village.

110.   Upon information and belief, a five-acre lot in the Village, should it exist and be for sale, would be approximately $2,000,000 to $3,500,000.

111.   The Village's FEAF admits that "the price [for a 5-acre lot] would be prohibitive" for a place of worship.

112.   Such cost is prohibitively expensive for the members of OJCCR, Plaintiff Congregations, or any congregation that wished to operate a neighborhood *shul* and renders Plaintiffs' communal religious exercise effectively impracticable.

113.   The individual members of the Plaintiff Congregations and the congregation members of OJCCR who live in the Village were prevented by the Village's land use regulations from living in a community that permits them to reside near a synagogue and exercise their religious faith communally within its jurisdiction.

### The Village's Land Use Regulations

114.   The Village is approximately 4.93 square miles in area.

115.    The Village regulates land use in its jurisdiction in part through the "Zoning Law of the Village of Chestnut Ridge, New York" (the "Zoning Law").

116.    The use of real property in the Village is subject to the laws and regulations of the Village, including its Zoning Law.

117.    Prior to February 21, 2019, the Village's Zoning Law contained various onerous and discriminatory land use regulations that burdened the Plaintiffs' religious exercise and discriminated against the religious land use.

118.    According to the Village's "Table of General Use Requirements -- Part I: Residential Districts," the Village's Zoning Law designated "Churches and similar places of worship including parish houses and rectories but not including schools of general or religious instruction" (hereinafter, "Churches" or "places of worship") as a "Use[] by Special Permit of the Village Board" in the Village's RR-50, R-40, R-35, R-25, R-15, and RSH residential zoning districts (Use Group "c").

119.    The Village's land use regulations treated Churches on less than equal terms as practically every other nonreligious assembly and institutional use in the Village.

120.    Places of worship were prohibited outright in non-residential zoning districts in the Village.

121.    According to the Village's "Table of Bulk Requirements" (the "Table of General Use Requirements -- Part I: Residential Districts" and the "Table of Bulk Requirements" are collectively referred to as the "Challenged Laws"), in each of the aforementioned zoning districts where Churches were permitted by "Special Permit," they were subject to the following "Bulk Regulations":

     a.     Minimum Lot Area of five acres

      b.      Lot Width of 400 feet

      c.      Front Setback of 100 feet

      d.      Front Yard, 50 feet

      e.      Side Setback of 100 feet

      f.      Total Side Setback of 200 feet

      g.      Side Yard, 75 feet

      h.      Rear Setback of 100 feet

      i.      Rear Yard, 75 feet

      j.      Street Frontage of 300 feet

      k.      Maximum Height of 35 feet

      l.      Development Coverage of 25%

      m.      Floor Area Ratio of 0.20

122.    The Defendant has described these land use regulations affecting places of worship as: "impediments to the free practice of religion, . . . ."

123.    Various other assembly and institutional uses are permitted in the Village and are subject to less onerous Bulk Regulations.

124.    Libraries, museums, and art galleries, which are permitted in certain residential zoning districts in the Village as a "Conditional Use" by the Village's Planning Board, are subject to the following Bulk Regulations (Use Group "d"):

      a.      Minimum Lot Area of two acres

      b.      Lot Width of 200 feet

      c.      Front Setback of 100 feet

      d.      Front Yard, 100 feet

      e.        Side Setback of 100 feet

      f.        Total Side Setback of 200 feet

      g.        Side Yard, 25 feet

      h.        Rear Setback of 100 feet

      i.        Rear Yard, 25 feet

      j.        Street Frontage of 50 feet

      k.        Maximum Height of 35 feet

      l.        Development Coverage of 10%

      m.        Floor Area Ratio of 0.20

125.    Libraries, museums, art galleries, and funeral chapels, which are permitted by right in certain non-residential zoning districts in the Village, are subject to the following Bulk Regulations (Use Group "B"):

      a.        Minimum Lot Area of 20,000 square feet

      b.        Lot Width of 100 feet

      c.        Front Setback of 30 feet

      d.        Front Yard, 20 feet

      e.        Side Setback of zero feet

      f.        Total Side Setback of zero feet

      g.        Side Yard, zero feet

      h.        Rear Setback of 25 feet

      i.        Rear Yard, 25 feet

      j.        Street Frontage of 100 feet

      k.        Maximum Height of 30 feet

l.      Development Coverage of 70%

m.      Floor Area Ratio of 0.40

126.    Nursery schools, which are permitted in certain zoning districts in the Village as a Conditional Use by the Village's Planning Board, are subject to the following Bulk Regulations (Use Group "g"):

a.      Minimum Lot Area of two acres

b.      Lot Width of 200 feet

c.      Front Setback of 100 feet

d.      Front Yard, 100 feet

e.      Side Setback of 100 feet

f.      Total Side Setback of 200 feet

g.      Side Yard, 25 feet

h.      Rear Setback of 100 feet

i.      Rear Yard, 25 feet

j.      Street Frontage of 50 feet

k.      Maximum Height of 35 feet

l.      Development Coverage of 20%

m.      Floor Area Ratio of 0.20

127.    "Medical and dental clinics, health service complexes," which are permitted by right in certain non-residential zoning districts, and "Commercial recreation facilities," and "Outdoor recreation facilities," which are permitted in certain non-residential zoning districts in the Village as a Conditional Use by the Village's Planning Board, are subject to the following Bulk Regulations (Use Group "J"):

18

a.      Minimum Lot Area of 60,000 square feet

b.      Lot Width of 200 feet

c.      Front Setback of 75 feet

d.      Front Yard, 25 feet

e.      Side Setback of 75 feet

f.      Total Side Setback of 150 feet

g.      Side Yard, 35 feet

h.      Rear Setback of 75 feet

i.      Rear Yard, 30 feet

j.      Street Frontage of 100 feet

k.      Maximum Height of 35 feet

l.      Development Coverage of 70%

m.      Floor Area Ratio of 0.40

128.    "Hotels and motels," which are permitted in certain non-residential zoning districts in the Village as a Conditional Use by the Village's Planning Board, are subject to the following Bulk Regulations (Use Group "I"):

a.      Minimum Lot Area of two acres

b.      Lot Width of 300 feet

c.      Front Setback of 60 feet

d.      Front Yard, 20 feet

e.      Side Setback of 50 feet

f.      Total Side Setback of 100 feet

g.      Side Yard, 20 feet

    h.      Rear Setback of 60 feet

    i.       Rear Yard, 30 feet

    j.       Street Frontage of 150 feet

    k.      Maximum Height of 35 feet

    l.       Development Coverage of 70%

    m.     Floor Area Ratio of 0.40

129.    "Shopping Centers," "Community centers," and "Health clubs and spas," which are permitted by right in certain non-residential zoning districts in the Village, and "Movie Theatres," which are permitted by Special Permit in certain non-residential zoning districts in the Village, are subject to the following Bulk Regulations (Use Group "M"):

    a.      Minimum Lot Area of 15 acres

    b.      Lot Width of 500 feet

    c.      Front Setback of 40 feet

    d.      Front Yard, 30 feet

    e.      Side Setback of 50 feet

    f.       Total Side Setback of 100 feet

    g.      Side Yard, 30 feet

    h.      Rear Setback of 40 feet

    i.       Rear Yard, 30 feet

    j.       Street Frontage of 500 feet

    k.      Maximum Height of 35 feet

    l.       Development Coverage of 70%

    m.     Floor Area Ratio of 22 [sic]

130.    For each type of bulk regulation, the Challenged Laws treated various nonreligious assembly and institutional land uses better than "Churches."

131.    In general, the Challenged Laws treated nonreligious assembly and institutional land uses more favorably than places of worship.

132.    A Special Permit use (including any place of worship within the Village) had to be approved by the Village's Board of Trustees and is subject to Article XVI, Section 2 of the Zoning Law.

133.    Article XVI of the Zoning Law states in part that "[t]he Village Board, in considering any application for a special permit hereunder, <u>shall exercise such discretion reserved for legislative matters</u> so as to ensure that the public health, welfare and safety are protected and the environmental and land resources of the Village are most efficiently utilized."   (Emphasis added.)

134.    Such "discretion reserved for legislative matters" is boundless, and there are no concrete standards to be used in determining whether a Special Permit is granted.

135.    The Village has stated in its FEAF: "Although a special use permit must be obtained from the Village Board [for a place of worship], in the existing zoning code, there are no specific criteria or standards required to be met."

136.    The Zoning Law contained no objective criteria to be used by the Village Board in determining whether a Church use will be permitted.

137.    The Zoning Law's land use regulations applicable to places of worship, which provided for "legislative" discretion on the part of the Village Board when deciding whether to grant a Special Permit anywhere within the Village's jurisdiction, granted the Village Board

unbridled discretion in determining whether to permit places of worship in the residential zoning districts where such use was permitted, even if the Bulk Regulations described above were met.

138.    The Zoning Law's land use regulations applicable to places of worship provided the Village Board with the power to discriminate by suppressing disfavored speech or disliked speakers.

139.    Several nonreligious assembly and institutional uses are permitted "by right" in certain zoning districts in the Village, and do not require a Special Permit from the Village Board, including Nursery schools; "Libraries, museums, and art galleries" (in nonresidential zoning districts); and "Medical and dental clinics, health service complexes."

140.    Several nonreligious assembly and institutional land uses are permitted as a Conditional Use by the Village's Planning Board in certain zoning districts in the Village, and do not require a Special Permit from the Village Board, including "Libraries, museums, and art galleries" (in residential zoning districts); "Commercial recreation facilities"; "Outdoor recreation facilities"; and "Hotels and motels."

141.    "Conditional Uses" are permitted by the Village's Planning Board and do not require review by the Village Board.

142.    The Zoning Law states that Conditional Uses may be granted by the Planning Board "in accordance with the procedures and standards" contained in Article III, Section 2, Use Table, Column C.

143.    The Planning Board's review of Conditional Uses is subject to the standards described in Article XII of the Zoning Law, which are several enumerated standards to be used in determining the appropriateness of a Conditional Use.

144.    The Planning Board, in reviewing Conditional Uses, does not exercise "discretion reserved for legislative matters."

145.    Nonreligious institutional and assembly land uses permitted in the Village that are permitted by right or as a Conditional Use were treated on better terms than Churches.

146.    On February 21, 2019, the Village's Board voted upon and approved Resolution 2019-12, a new "House of Worship Law," which amended the Village's Zoning Law and, upon information and belief, substantially eased its provisions regulating places of worship.

147.    However, the new House of Worship Law was challenged in both state court (Supreme Court, Rockland County, Index No. 031506/2019) and this Court (Case No. 7:19-cv-03461).

148.    The Petitions in both the state and federal court proceedings are seeking to prevent the application of the new House of Worship Law. The Village's actions described above all took place under color of state law.

149.    The Village was informed of the applicability of federal law to its actions.

150.    The Village possessed no compelling or sufficiently substantial governmental interest to justify the restrictions on Churches contained in the Zoning Law.

151.    The Village's Zoning Law rendered new religious land uses within the Village effectively impracticable.

152.    The Special Permit requirement for Churches unreasonably provided the Village with unbridled discretion to determine whether and where particular religious expression will be permitted.

## COUNT I
### Free Exercise Clause

**United States Constitution,**
**First and Fourteenth Amendments**
**42 U.S.C. § 1983**

153.    Plaintiffs repeat and reallege paragraphs 1 through 152 as if fully set forth herein.

154.    Defendant's laws, on their face and as applied, have deprived Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment by burdening their religious exercise, by discriminating against and targeting the Plaintiffs for disfavor on the basis of religion, and by treating religious assembly and institutional land uses on less than equal terms as nonreligious institutional and assembly land uses.

Defendant has caused the Plaintiffs to suffer irreparable harm, damage and injury.


**COUNT II**
**Free Speech Clause**
**United States Constitution,**
**First and Fourteenth Amendments**
**42 U.S.C. § 1983**

155.    Plaintiffs repeat and reallege paragraphs 1 through 154 as if fully set forth herein.

156.    Defendant's laws, on their face and as applied, have deprived Plaintiffs of their right to free speech, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment.  The standards set forth in the Village's land use regulations governing Special Permits for places of worship unconstitutionally afforded the Village Board unbridled discretion in its review of such an application and, as such, were an unconstitutional prior restraint on Plaintiffs' protected religious expression and exercise under the First Amendment.

157.    Defendant has caused the Plaintiffs to suffer irreparable harm, damage and injury.

**COUNT III**
**Equal Protection Clause**
**United States Constitution,**
**Fourteenth Amendment**
**42 U.S.C. § 1983**

158.    Plaintiffs repeat and reallege paragraphs 1 through 157 as if fully set forth herein.

159.    Defendant's laws, on their face and as applied, have deprived Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment, by (1) discriminating against and targeting the Plaintiffs for disfavor on the basis of religion; and (2) by treating religious institutions on less than equal terms as similarly situated nonreligious institutions.

160.    Defendant has caused the Plaintiffs to suffer irreparable harm, damage and injury.

**COUNT IV**
**Violation of Religious Land Use and Institutionalized**
**Persons Act of 2000 – "Substantial Burdens"**
**42 U.S.C. § 2000cc(a)**

161.    Paragraphs 1 through 160 are incorporated by reference as if set forth fully herein.

162.    Defendant's laws, on their face and as applied, have deprived the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that placed a substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

**COUNT V**
**"Nondiscrimination"**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(2)**

163.   Plaintiffs repeat and reallege paragraphs 1 through 162 as if fully set forth herein.

164.   Defendant's laws, on their face and as applied, have deprived Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing land use regulations that both on their face and as applied discriminated against the Plaintiffs on the basis of religion.

## COUNT VI
### "Equal Terms"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(b)(1)

165.   Plaintiffs repeat and reallege paragraphs 1 through 164 as if fully set forth herein.

166.   Defendant's laws, on their face and as applied, have deprived Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing land use regulations that both on their face and as applied treated religious assemblies and institutions on less than equal terms as nonreligious assemblies and institutions.

## COUNT VII
### "Exclusions and Limits"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(b)(3)(B)

167.   Plaintiffs repeat and reallege paragraphs 1 through 166 as if fully set forth herein.

168.   Defendant's laws, on their face and as applied, have deprived Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing land use regulations that unreasonably limited places of worship within its jurisdiction.

<u>**COUNT VIII**</u>
**New York Constitution,**
**Art. I § 3**

169.    Plaintiffs repeat and reallege paragraphs 1 through 168 as if fully set forth herein.

170.    Defendant's laws, on their face and as applied, have deprived all Plaintiffs of their rights guaranteed by Article I Section 3 of the New York State Constitution, which provides: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind . . . ." N.Y. Const. Art. I, § 3.

171.    Defendant has caused the Plaintiffs to suffer irreparable harm, damage and injury.

<u>**RELIEF SOUGHT**</u>

**WHEREFORE**, Plaintiffs demand Judgment as follows:

A.    Declaratory judgment holding that the Challenged Laws governing "Churches" are unconstitutional and illegal under the Free Exercise and Free Speech Clauses of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the New York Constitution, Article I § 3;

B.    Preliminary and permanent orders enjoining the application of the Challenged Laws governing Churches;

C.    An award of compensatory damages against Defendant in favor of the Plaintiffs in such amount as the Court deems just for the loss of the Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, the

Religious Land Use and Institutionalized Persons Act, and the New York Constitution incurred by the Plaintiffs, and caused by the Defendant's laws and actions;

D.     An award to Plaintiffs of full costs, disbursements and attorneys' fees, to the extent permitted by law, arising out of Defendant's laws and actions and out of this litigation;

E.     Granting such other, further and different relief as to this Court deems just, proper and equitable.

Respectfully submitted by the Plaintiffs this 16th day of July, 2019.

**STORZER & ASSOCIATES, P.C.**

_/s/_
_____
Roman Storzer (admitted _pro hac vice_)
Robert L. Greene (RG 5430)
1025 Connecticut Avenue, N.W.
Suite One Thousand
Washington, DC 20036
Tel: (202) 857-9766

**SAVAD CHURGIN, LLP**

Joseph Churgin (JC 6854)
Donna Sobel (DS 3267)
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954
Tel: (845) 624-3820

_Attorneys for Plaintiffs_
